STEPAN COMPANY, Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD, Respondent-Appellee.

Third District No. 3—88—0004

Opinion filed February 8, 1990.

Mayer, Brown & Platt, of Chicago (Percy L. Angelo, of counsel), for petitioner.

Neil F. Hartigan, Attorney General, of Springfield (Patricia E. Collins, Assistant Attorney General, of Chicago, of counsel), for respondent.

JUSTICE STOUDER delivered the opinion of the court:

Pursuant to sections 29 and 41 of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1987, ch. 111½, pars. 1029, 1041), appellant Stepan Chemical Company (Stepan) seeks administrative review of the November 25, 1987, final order of the Illinois Pollution Control Board (the Board). The final order amends sections 211 and 215 of the Illinois Administrative Code (35 Ill. Adm. Code §§211, 215 (1985)), regarding air emission rules applicable to air oxidation processes in the synthetic organic-chemical industry.

Stepan maintains the Board failed to consider the proper statutory factors in enacting the regulations and the adoption of a December 31, 1987, compliance date was arbitrary, unreasonable, and capricious. Stepan asks this court to vacate the Board's November 25, 1987, final order amending sections 211 and 215 of the Illinois Administrative Code (35 Ill. Adm. Code §§211, 215 (1985)), and to remand this matter to the Board with directions to take into consideration factors set forth in section 27(a) of the Act (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a)), and to adopt a reasonable compliance date.

On September 23, 1986, the Illinois Environmental Protection Agency (IEPA) filed with the Board amendments to rules and regulations of the State of Illinois with regard to air pollution. On November 25, 1987, in docket No. R86—40, the Board adopted a rule which amended Rules 211 and 215. The Board promulgated this rule pursuant to a congressional mandate found within the Federal Clean Air Act

(CAA) (42 U.S.C. §7410 *et seq.* (1982)). The rule limits the amount of volatile organic material (VOM) that can be emitted from facilities using an air-oxidation process. The Board established a December 31, 1987, compliance date. Stepan challenges the Board's final order.

The rule requires process vent streams to be vented to a combustion device that is designed and operated either to reduce VOM emissions by at least 98% or to emit less than 20 parts per million VOM. The limitations only apply if the vent streams have a total resource effectiveness (TRE) of less than 1.0, as determined by a specified formula, and the vent streams are not controlled by an existing combustion device. The rule also contains a "grandfather clause" providing that facilities with existing combustion devices to control process VOM emissions do not have to meet the 98% limit until the combustion device is replaced. A combustion device is considered to be replaced when all of the device is replaced, or when the cost of replacement of part of the device equals 50% or more of the cost of replacing the entire device. The Board also noted that significant repairs can be considered a replacement.

The rule applies to plants using air oxidation processes located in Will, McHenry, Cook, Du Page, Lake, Kane, Madison, St. Clair, Macoupin, and Monroe Counties. Will and McHenry Counties, although listed by the United States Environmental Protection Agency (USEPA) as ozone attainment areas or unclassified areas, are included under the rule because they are located within a major urbanized area which is designated an ozone nonattainment area.

An air oxidation process is defined under the rule as any unit process which uses air or a combination of air and oxygen as an oxidant in combination with one or more organic reactants to produce one or more organic compounds. (35 Ill. Adm. Code §215.521 (1985).) Air oxidation processes are characterized by the emission of large amounts of inert material, primarily nitrogen, containing a low concentration of VOM to the atmosphere. The record indicates there are at least four oxidation processes in Illinois affected by the new rule.

The instant matter came before the Board upon a proposal of the IEPA to amend certain portions of sections 211 and 215 of the Illinois Administrative Code (35 Ill. Adm. Code §§211, 215 (1985)) pertaining to emissions of VOM released by air oxidation processes. The origin of this proceeding is rooted in the requirements of the CAA (42 U.S.C. §7401 *et seq.* (1982)). Pursuant to section 109 of the CAA (42 U.S.C. §7409 (1982)), the USEPA adopted a national ambient air quality standard (NAAQS) for ozone. Compliance with this NAAQS was to have been demonstrated for all areas of Illinois by December 31, 1982,

according to the provisions of section 172(a)(1) of the CAA. (42 U.S.C. §7502(a)(2) (1982).) Illinois, however, was unable to make such a demonstration and, therefore, applied for and received an extension of this deadline until December 31, 1987. The CAA (42 U.S.C. §7401 *et seq.* (1982)) requires that Illinois revise its State implementation plan (SIP) for existing stationary emission sources in ozone nonattainment areas to require the use of reasonably available control technology (RACT). Under the CAA, the USEPA requires that the SIP include, at least for major urban areas, enforceable regulations reflecting the application of RACT to those stationary sources for which the USEPA has published control technique guidelines (CTG) after 1978.

Legally enforceable RACT regulations must be submitted to the USEPA for all sources for which CTGs have been published. CTGs define RACT for selected categories of air emission sources. The USEPA's Office of Air Quality Planning and Standards issues CTGs to State and local air pollution control agencies in order to provide them with information regarding achievable emission standards and the types of controls which are considered to be reasonably available. The USEPA published a final CTG for the control of emissions from air oxidation processes in the synthetic organic-chemical manufacturing industry in December of 1984.

The USEPA issued the CTG for control of emissions from air oxidation processes with the intention that RACT cover air oxidation facilities that emit volatile organic compounds, compounds which participate in atmospheric photochemical reactions to produce ozone. The recommended RACT was to be applicable to air-oxidation facilities within the synthetic organic-chemical manufacturing industry. This includes all reactors in which air is used as an oxidizing agent to produce an organic chemical, and is based on incineration of process vent streams discharged to the atmosphere, and for which the TRE index value is less than 1.0.

The Board held two hearings in docket No. R86—40. On February 24, 1987, the Board held a hearing in Springfield, Illinois. Richard Forbes, manager of the Control Programs Unit in the IEPA's Air Pollution Control Division, testified as to the IEPA's rationale for selecting the geographic coverage area for the proposed amendments. Forbes testified that although Will County is designated an ozone attainment area, emissions from Will County impact upon the ozone air quality of the other counties in the ozone nonattainment area. Dr. John Reed, supervisor of the Technical Support Unit of the IEPA's Air Quality Planning Section, testified regarding the production of air oxidation chemicals and the requirements for Illinois under the CAA. Reed

indicated the four Illinois plants affected by the rule change would have little difficulty complying with the new rule. Reed commented that the State sent questionnaires to those plants requesting information on their processes. He noted that based on the information provided him from the responses to the questionnaire, all streams would be in compliance. With respect to the economic reasonableness of the rule, Reed commented that since the determination of the RACT adequacy was based on the TRE index, the maximum cost effectiveness would be $1,600 per megagram, or $1,452 per ton. He also noted that since no streams required additional control, Illinois industry would incur no costs due to the rule change.

On March 10, 1987, the Board held a hearing in Chicago on the proposed rule. Dan Muno, manager of Stepan's corporate environment engineering department, testified regarding the rule's application to Stepan. Muno argued the rule's definition of process vent stream was vague and should not include vents that result from the product purification process. In addition, Muno argued the grandfather clause was unfair in lieu of Stepan's installation in 1978 of an innovative catalytic incinerator at a cost of approximately $2 million which has met design requirements and provided 89% to 96% control for VOM. Muno finally argued the proposed use of Reference Method 18 of the USEPA guidelines used to determine the concentration of all organics is inapplicable to Stepan's plant and that therefore the Board's rule should include a provision for an alternative method.

On May 7, 1987, the Illinois Department of Energy and Natural Resources (DENR) issued a negative declaration to the Board stating its determination that a formal economic impact study (EcIS) was not necessary in the instant case based on DENR's belief that no Illinois facility had annual emissions great enough to be affected by the rule. Later, in June 1987, following Stepan's filing of comments with the Board, DENR issued an updated negative declaration. DENR addressed Stepan's claim that many facilities would not be in compliance under the proposed rule by stating that the new information provided it did not convince it that an EcIS was required. DENR based the updated negative declaration on the statutory criterion that the cost of making a formal study was economically unreasonable in relation to the value of the study to the Board in determining the adverse impact of the regulation. (Ill. Rev. Stat. 1987, ch. 96½, par. 7404(d).) On June 24, 1987, the Economic and Technical Advisory Committee (ETAC) issued its concurrence in DENR's finding that an EcIS was not necessary for the R86—40 rulemaking proceeding.

On July 16, 1987, the Board issued its "First Notice, Proposed

Opinion and Order," in R86—40. The Board noted the basis for the rule change was to correct deficiencies in the Illinois SIP which had been identified by the USEPA. Regarding geographic coverage, the Board concluded that it would propose the rule be applicable to the 10 counties previously mentioned. With respect to the applicability of the rule to all streams, the Board adopted the IEPA's language regarding vent coverage. The Board then responded to Stepan's request that Reference Method 18 be replaced by substituting Reference Method 25A in place of Reference Method 18.

On November 25, 1987, the Board issued its final order, submitting the rule change to the Secretary Of State's office for final notice. The Board concluded the rule's geographic coverage would include all 10 counties previously mentioned, that the rule covered reactor bottoms streams since technology to control these streams is reasonably available, that Reference Method 25A would be appropriate in the circumstances presented by Stepan, and with respect to the grandfather clause, the Board commented that a facility did not have to meet the emission limitations if the facility has an existing combustion device, until that device is replaced. The Board noted that the intention of the grandfather clause was to allow facilities like Stepan's, which have made a relatively recent investment updating their combustion devices, to avoid having to replace the combustion device during its useful life. Stepan brings the instant appeal.

■ When an administrative agency, such as the Board, exercises its rulemaking powers, it is performing a quasi-legislative function, and, therefore, it has no burden to support its conclusions with a given quantum of evidence. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1988), 177 Ill. App. 3d 923, 532 N.E.2d 987.) The appellants sustain a high burden of establishing the invalidity of regulations promulgated by the Board. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1977), 49 Ill. App. 3d 954, 364 N.E.2d 631.) Because administrative agencies are inherently more qualified to decide technical problems, this court, when reviewing administrative rules and regulations, may not invalidate a regulation unless it is clearly arbitrary, unreasonable, or capricious. *Central Illinois Light Co. v. Pollution Control Board* (1987), 159 Ill. App. 3d 389, 511 N.E.2d 269.

Stepan first contends the Board's decision was arbitrary, unreasonable, and capricious because the Board failed to take into account the technical feasibility and economic reasonableness of the rule. Stepan asserts the Board exclusively relied upon the USEPA's CTG in rendering its decision. Stepan argues the CTG only pertains to air oxidation

systems and the associated product recovery systems. Stepan maintains the CTG does not pertain to its distillation processes. Thus, the Board's determination that the CTG's scope includes Stepan's distillation processes or storage tanks was arbitrary, unreasonable, and capricious.

■ The record indicates the Board considered both the technical feasibility and the economic reasonableness of the rule. In its proposed opinion and order for first notice, the Board noted the IEPA presented evidence that technology to control the process streams was reasonably available, the method for controlling the streams was included in the CTG, and the method was sound. The Board opined that the scope of the CTG included Stepan's distillation columns and storage tanks. Moreover, Stepan presented no evidence indicating compliance was not technically feasible.

We note it is not this court's role to determine if the manifest weight of the evidence reveals that it was technically feasible and economically reasonable for a substantial number of the affected sources to comply with a proposed Board rule; it is only necessary that the record reflect that these factors were taken into account. (*Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212.) The record indicates, despite Stepan's contention to the contrary, the Board considered the technical feasibility and economic reasonableness of the rule. We believe, therefore, the Board's findings on the issue of technical feasibility were not arbitrary, unreasonable, or capricious.

Stepan next contends the Board's decision that the rule was technically feasible and economically reasonable was based on a TRE alternative inapplicable to Stepan. Stepan contends where the TRE alternative is not available, there is no evidence in the record as to technical feasibility and economic reasonableness of the rule.

■ The Board originally proposed that Stepan implement Reference Method 18 to determine TRE. However, Stepan objected and suggested the Board allow the IEPA to substitute appropriate alternative tests in such situations. The Board recognized and noted Stepan's concerns and determined that Reference Method 25A be used instead. Stepan, however, contends that Reference Method 25A is also inapplicable to the present situation. We note that the Board heard and appreciated the concerns raised by Stepan with respect to Reference Method 18. The Board then unanimously agreed to substitute Reference Method 25A in place of Reference Method 18. We are not a technically qualified superagency ready to determine whether the Board's decision with respect to Reference Method 25A was right or wrong.

This court should not engage in weighing the evidence in this matter in order to determine whether the Board's action was the correct one. Based upon the record presented, we believe the Board's decision to replace Reference Method 18 with Reference Method 25A was not arbitrary, unreasonable, or capricious.

■ Section 27(a) of the Act directs the Board, in promulgating regulations, to take into account the technical feasibility and economic reasonableness of reducing the particular type of pollution sought to be regulated. (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).) The standards set forth in section 27(a) reflect a legislative intent to prescribe Board rulemaking to the extent necessary to insure that the Board acts within the boundaries of its delegated authority. (*Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212.) The section does not mandate any particular standards that the Board must comply with in adopting its rules nor does it impose specific requirements applicable to the resolution of individual challenges of a regulation. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1988), 177 Ill. App. 3d 923, 532 N.E.2d 987.) We believe, after reviewing the record submitted in the instant case, the Board acted in accordance with the requirements of section 27(a) in adopting the rule.

■ Stepan next asserts the compliance date established by the Board was arbitrary, unreasonable, and capricious. The Board adopted the rule on November 25, 1987, and established a December 31, 1987, compliance date. Stepan contends the Board's action violates its rights to due process by placing it in jeopardy of enforcement without time for compliance. Stepan maintains that, given the short time span between the date of adoption of the rule and the compliance deadline, compliance with the rule was technically infeasible and, therefore, the rule was not promulgated in accordance with section 27(a) of the Act. (Ill. Rev. Stat. 1987, ch. 111½, par. 1027(a).) We believe this argument is meritless. The grandfather clause provides ample time for compliance.

Stepan next proposes that the effect of the compliance date is to require Stepan to close down its Will County plant and such constitutes a taking under the Illinois and United States Constitutions. (See *Nollan v. California Coastal Comm'n* (1987), 483 U.S. 825, 97 L. Ed. 2d 677, 107 S. Ct. 3141.) Stepan proposes the air emission rule does not serve a legitimate State interest in reducing air emissions, nor does it bear any rational relation to the ends sought, that of providing technically feasible and economically reasonable air oxidation emissions limitations. The Board, however, noted that the CAA required compliance with the rule, a RACT rule, by December 31, 1987.

■ In *Nollan*, the California Coastal Commission attempted to condition the grant of a rebuilding permit on the property owner's transfer to the public of an easement across beachfront property. The Supreme Court held that even though the Commission's action constituted a taking, it could be allowed for land use regulation if it substantially furthered governmental purposes that justified denial of the permit. The rule, in the instant case, requiring air oxidation facilities to limit their emissions of VOM in order to protect the ozone substantially furthers the governmental purpose of restoring, protecting, and enhancing the quality of the environment. (Ill. Rev. Stat. 1987, ch. 111½, par. 1002(b).) We believe, therefore, Stepan's argument is without merit.

■ Regarding Stepan's argument that the Board's failure to require the preparation of an economic impact study violated section 27(b) of the Act and was arbitrary, unreasonable, and capricious, we respectfully disagree. Stepan contends the Board had no authority to proceed with the adoption of the rule without complying with the economic impact consideration requirements of section 27(b) of the Act. Ill. Rev. Stat. 1987, ch. 111½, par. 1027(b).

Section 27(b) does not require an EcIS from DENR in every instance. (See Ill. Rev. Stat. 1987, ch. 111½, par. 1027(b).) Section 27(b) requires DENR to prepare an EcIS as provided in the statute. However, where, as here, DENR believes the cost of making a formal study is economically unreasonable in relation to the value of the study to the Board in determining the adverse economic impact of the regulation, the DENR may find preparing an EcIS unnecessary. (Ill. Rev. Stat. 1987, ch. 96½, par. 7404.) On May 7, 1987, DENR issued its negative declaration noting that because no Illinois facilities are believed to have annual emissions great enough to be affected by the proposal, no EcIS was necessary. Stepan later claimed, however, that it believed many facilities would not be in compliance with the rule and that an EcIS should be prepared.

On June 19, 1987, DENR issued a second negative declaration noting that an EcIS was economically unreasonable in relation to the value of the study to the Board's determination. (Ill. Rev. Stat. 1987, ch. 96½, par. 7404(d).) In addition, ETAC, after reviewing DENR's second negative declaration, concurred in the DENR's opinion regarding the necessity of preparing an EcIS. We emphasize that this court should not weigh the evidence presented in order to determine whether an EcIS should have been prepared. Accordingly, the Board's decision not to prepare an EcIS was not arbitrary, unreasonable, or capricious.

Stepan finally contends that because its plant is located in an ozone attainment area it should not be subjected to the RACT standards. Stepan presented an expert witness who stated that Chicago-area ozone nonattainment was not due to Will County emissions. The Board, however, disagreed with Stepan's expert witness and included Will County under the rule change. The Board cited the need to control VOM emissions in Will County in order to control ozone in the ozone nonattainment counties of the Chicago area.

■ We note that Stepan commented in its brief that "there is certainly dispute as to whether compliance with RACT is necessary in Will County and as to whether controls are necessary in Will County to attain ozone compliance in the Chicago area." We believe it is not the province of this court to resolve such technical disputes. The State legislature created a Pollution Control Board comprised of technically qualified individuals in order to resolve disputes like the one in the instant case. We believe the Board did not act arbitrarily, unreasonably, or capriciously in designating Will County as part of the Chicago-area nonattainment zone.

■ It is not this court's role to determine whether the Board's action in the instant case was wise, or even if it was the most reasonable based on the record. (*Central Illinois Public Service Co. v. Pollution Control Board* (1987), 116 Ill. 2d 397, 507 N.E.2d 819.) The Board, unlike this court, is well equipped to determine the degree of danger which a pollutant will cause, and then to balance the public threat against an alleged individual hardship. (*Monsanto Co. v. Pollution Control Board* (1977), 67 Ill. 2d 276, 367 N.E.2d 684.) By definition the Board's regulations are founded upon application of agency expertise. The courts should not, and by general agreement, may not, act as "superagencies." Such is essential if the basic notion of separation of powers is to survive. (See *Shell Oil Co. v. Pollution Control Board* (1976), 37 Ill. App. 3d 264, 346 N.E.2d 212.) We believe the Board considered the technical feasibility and economic reasonableness of the rule. We conclude, therefore, under these circumstances, the Board's actions in adopting the proposed rule were not arbitrary, unreasonable, or capricious.

We affirm the November 25, 1987, order of the Illinois Pollution Control Board.

Affirmed.

HEIPLE, P.J., and BARRY, J., concur.