WASTE MANAGEMENT OF ILLINOIS, INC., Petitioner-Appellant, v. THE POLLUTION CONTROL BOARD, Respondent-Appellee.

First District (4th Division)   Nos. 1—90—2702, 1—90—2818 cons.

Opinion filed June 11, 1992.

Percy L. Angelo, Kathleen M. Donahue, and Ronald G. Hayden, all of Mayer, Brown & Platt, of Chicago, for petitioner.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Matthew J. Dunn, Joseph J. Annunzio, William D. Seith, and Elizabeth A. Wallace, Assistant Attorneys General, of Chicago, of counsel), for respondent.

PRESIDING JUSTICE JIGANTI delivered the opinion of the court:

The petitioner, Waste Management of Illinois, Inc. (WMI), has appealed directly from an order of the respondent, the Illinois Pollution Control Board (Board), pursuant to the provisions of the Illinois Environmental Protection Act and Supreme Court Rule 335. (Ill. Rev. Stat. 1989, ch. 111½, pars. 1029, 1041; 134 Ill. 2d R. 335.) In its order the Board adopted regulations which upgraded the development, operation and reporting requirements for new and existing nonhazardous waste landfills. (35 Ill. Adm. Code §§807, 810 through 815 (1991).) WMI contends on appeal that the Board acted arbitrarily and capriciously in adopting certain regulations concerning the monitoring and processing of landfill gas and in imposing certain groundwater modeling and monitoring requirements. WMI further contends that the Board exceeded its statutory authority in promulgating the regulations pertaining to the Construction Quality Assurance Program, in preventing commercial landfills from self-insuring, in imposing a regulation that delays the finality of Environmental Protection Agency (Agency) permit decisions and in allowing the Agency to unilaterally modify a permit. WMI also contends that the Board failed to comply with the applicable law and its own resolutions regarding contact with its scientific/technical section staff.

On August 17, 1990, the Board entered an order adopting new regulations for nonhazardous waste landfills. The regulations were promulgated based upon data and testimony introduced in two rulemaking proceedings, R84-17 and R88-7, over the course of six years. The regulations challenged by WMI in this appeal were promulgated in the rulemaking proceeding docketed as R88-7. R88-7 had its inception in a prior rulemaking proceeding which was docketed as R84-17. R84-17 was initiated by the Board to consider a draft proposal for new landfill regulations filed by the Illinois Environmental Protection Agency. Other interested groups, both public and private, filed alternate proposals in R84-17. WMI filed one of the alternate proposals. The Board held approximately 23 hearings in R84-17.

On February 19, 1987, the Board entered an order finding that no single proposal pending before it was sufficiently refined or comprehensive to be adopted. The Board determined that it was necessary for it to draft its own proposal with the assistance of its scientific/technical and legal staff. The Board then directed its scientific/technical section (STS) to review the record in R84-17 for the purpose of making regulatory recommendations to the Board. The Board recog-

nized that if the STS staff filed its own proposal, members of the staff would be called as witnesses to provide substantive testimony. In order to allow the STS staff to support its own proposal without affecting the Board's independence as a decision maker, the Board acted pursuant to its own resolution RES86-1 and declared the STS to be considered "exterior to the Board" for purposes of the Board's *ex parte* rules.

The STS staff filed its proposal in May and June of 1987 and hearings were held. After hearings on the STS staff's proposal were completed, the Board entered an order directing the STS staff to resume communications with the Board in order to allow the Board to informally consult with the staff concerning the technical details contained in the R84-17 record. The Board found that "as the basis for and comments concerning the STS proposal are a matter of public record, the Board now feels that it may, without prejudice to the integrity of its process, terminate its 'arm's length' dealing with the STS staff." WMI objected to the order on the grounds that a conflict of interest resulted from allowing the STS staff to resume communications with the Board.

On February 25, 1988, the Board published its own proposal as a new rulemaking proceeding, R88-7. The Board then conducted hearings and requested comments from participants in the new rulemaking proceeding. The Department of Energy and Natural Resources prepared an economic impact study to assist the Board in determining the economic impact of the proposed landfill regulations on the people of the State of Illinois. The Board on August 17, 1990, adopted the new regulations for nonhazardous waste landfills, relying substantially upon its own proposal in docket R88-7.

In bringing this appeal, WMI emphasizes that it is in agreement with the majority of the regulations and is challenging only those regulations which it believes lacked evidentiary support or were promulgated in the absence of statutory authority. Briefly, WMI is challenging as arbitrary and capricious section 811.310(d)(1) and section 811.310(d)(1)(F), which require ambient air monitoring for methane gas and monitoring for air contaminants to be defined in the future in a separate proceeding. WMI is also challenging on several grounds sections 811.312(b) and (g), which require that under certain circumstances landfill gas-processing centers must remain under the control of the landfill operator and be considered part of the waste disposal facility. WMI asserts that the groundwater modeling and monitoring regulations in sections 811.317 through 811.320 are neither technically feasible nor economically reasonable and were not supported by

the evidence at the hearings. WMI claims that the Board acted arbitrarily in adopting section 811.320(a), which requires that groundwater quality be maintained at each waste constituent's background concentration for 100 years after closure of the landfill's last unit, as measured 100 feet from the landfill boundary. Also, WMI maintains that the Board failed to consider the economic impact of section 811.319(a)(2)(A), which requires initial monitoring for unspecified constituents which may cause or contribute to groundwater contamination.

WMI is also challenging several regulations on the ground that the Board exceeded its statutory authority in imposing them. Among this category of regulations are sections 811.501 through 811.509, in which the Board adopted a Construction Quality Assurance Program. Section 811.715(d) sets out a gross revenue test for self-insurance which WMI contends unconstitutionally discriminates against commercial landfill operators. WMI asserts that the Board acted in excess of its statutory authority and in contravention of the administrative review law in adopting section 813.106(b), which purports to delay the finality of Agency permit decisions pending Agency reconsideration. WMI also challenges the Board's authority to promulgate section 813.201(b), which allows the Agency to unilaterally modify a permit. These regulations, along with the evidence produced to support or oppose them, will be set forth in detail as we consider the validity of each of the challenged regulations.

■■ Initially, we will set forth some of the general principles applicable to the issues raised in this appeal. When an administrative agency such as the Board exercises its rulemaking powers, it is performing a quasi-legislative function and therefore has no burden to support its conclusions with a given quantum of evidence. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1988), 177 Ill. App. 3d 923, 928, 532 N.E.2d 987.) The appellant bears a high burden in establishing the invalidity of regulations promulgated by the Board. (*Chamber of Commerce*, 177 Ill. App. 3d 923, 532 N.E.2d 987.) Because administrative agencies are inherently more qualified to decide technical problems, this court may not invalidate a regulation unless it is clearly arbitrary, unreasonable or capricious. (*Stepan Co. v. Pollution Control Board* (1990), 193 Ill. App. 3d 827, 833, 550 N.E.2d 682.) In *Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 524 N.E.2d 561, the supreme court stated certain guidelines for determining whether an administrative agency's action is arbitrary and capricious:

"Agency action is arbitrary and capricious if the agency: (1) relies on factors which the legislature did not intend for the agency to consider; (2) entirely fails to consider an important aspect of the problem; or (3) offers an explanation for its decision which runs counter to the evidence before the agency, or which is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Greer*, 122 Ill. 2d at 505-06, 524 N.E.2d at 581, citing *Motor Vehicle Manufacturers Association of the United States, Inc. v. State Farm Mutual Automobile Insurance Co.* (1983), 463 U.S. 29, 43, 77 L. Ed. 2d 443, 458, 103 S. Ct. 2856, 2866-67.

■ Section 27 of the Illinois Environmental Protection Act (Act) provides for the adoption of substantive regulations by the Board. (Ill. Rev. Stat. 1989, ch. 111½, par. 1027.) Section 27(a) directs the Board, in promulgating regulations, to take into account the technical feasibility and economic reasonableness of reducing the particular type of pollution sought to be regulated. Specifically, section 27(a) provides in pertinent part:

"In promulgating regulations under this Act, the Board shall take into account the existing physical conditions, the character of the area involved, including the character of surrounding land uses, zoning classifications, the nature of the existing air quality, or receiving body of water, as the case may be, and the technical feasibility and economic reasonableness of measuring or reducing the particular type of pollution. The generality of this grant of authority shall only be limited by the specifications of particular classes of regulations elsewhere in this Act." (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a).)

Section 27(a) also states that if the Board determines that an economic impact study should be done, the Department of Energy and Natural Resources should prepare it. (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(a).) Section 27(b) provides in pertinent part:

"In adopting any such new regulation, the Board shall consider those elements detailed in the Department's study and the Board shall, in its written opinion, make a determination, based upon the Department's study and other evidence in the public hearing record, as to whether the proposed regulation has any adverse economic impact on the people of the State of Illinois." (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(b).)

The standards set forth in section 27 reflect a legislative intent to prescribe Board rulemaking to the extent necessary to ensure that the Board acts within the boundaries of its delegated authority. *Ste-*

*pan Co. v. Pollution Control Board* (1990), 193 Ill. App. 3d 827, 835, 550 N.E.2d 682.

The first regulation challenged by WMI is section 811.310, which requires ambient air monitoring of methane gas at all putrescible waste landfills in addition to monitoring at certain defined emission points. Specifically, the regulation provides in pertinent part:

"At least three ambient air monitoring locations shall be chosen and samples shall be taken no higher than 0.025 meter (1 inch) above the ground and 30.49m (100 feet) downwind from the edge of the unit or at the property boundary, whichever is closer to the unit.

* * *

Ambient air monitors shall be sampled for methane only when the average wind velocity is less than 8 kilometers (five miles) per hour at a minimum of three downwind locations 30.49 meters (100 feet) from the edge of the unit or the property boundary, whichever is closer to the unit." 35 Ill. Adm. Code §§811.310(b)(8), (d)(2) (1991).

WMI states that it supports emission point monitoring, but that the evidence before the Board failed to show that ambient air monitoring would yield meaningful and useful results. WMI contends that the Board failed to consider the technical feasibility of ambient air monitoring and the regulation is therefore arbitrary and capricious.

The economic impact study (EcIS) prepared by the Department of Energy and Natural Resources (DENR) stated that methane is a major component of landfill gas, which has an explosive property when ignited in an atmosphere containing 5% to 15% methane. Although explosive concentrations of methane are not typically found in free ambient air, methane gas may infiltrate nearby structures and accumulate in sufficient concentrations to be easily ignited by an inadvertent source, causing disastrous results. The EcIS then gave examples of several documented cases where methane gas which had migrated from nearby landfills caused explosions with resulting fatalities. The STS staff, in a report accompanying its proposal, noted a case in which methane gas, in concentrations of 10% to 20%, had migrated 600 feet from the edge of a landfill. The report recommended that methane gas be monitored because it may create explosive conditions and may also kill vegetation.

The regulation adopted by the Board requires monitoring for methane gas in the ambient air one inch above the ground. Dr. Robert Hamm, an STS staff consultant, testified that technology in the area of ambient air monitoring was still evolving and that, in his opinion, it

was premature to incorporate such monitoring in a regulation. Dr. Hamm then made the following comments:

"In locations where trace components of the landfill gas have been measured above the landfill, to my knowledge those are situations where people have taken a probe and put it immediately on the soil, typically in a crack ***.

But in cases where the gas has permeated through the soil so you can pick up the landfill gas, hopefully as it leaves the soil and enters the atmosphere, I know of nobody that has been able to get any landfill gas constituents other than some of the major components, like methane and $CO_2$, and even then the results are subject to difficult interpretive problems ***."

Richard DiMambro, an STS staff member, admitted that "no one is very excited about ambient air monitoring."

■ We agree with WMI that the evidence cited by the Board in support of the technical feasibility and benefits of ambient air monitoring is not particularly strong. The Board's own consultant, Dr. Hamm, had misgivings about the usefulness of monitoring landfill gas in the ambient air. However, he did acknowledge that some of the major components of landfill gas, "like methane," had been detected by such monitoring. The Board had before it strong evidence of the harmful and destructive propensities of methane gas as well as its ability to migrate long distances. As previously stated, the Board regulation which was ultimately adopted required ambient air monitoring for methane gas only at a distance of one inch above the ground. Based on the evidence before it, the Board may have concluded that given the high degree of danger posed by migrating methane gas, ambient air monitoring was an appropriate tool in spite of its shortcomings. Giving due deference to the Board's expertise in this area, we cannot conclude that the ambient air monitoring requirement in section 811.310 is arbitrary and capricious.

WMI next challenges section 811.310(d)(1)(F), which requires below-ground monitoring of gas for air toxics included on a list which was to be adopted by the Board in the future in a separate rulemaking proceeding. Section 811.310(d)(1) provides as follows:

"All below ground monitoring devices shall be monitored for the following parameters at each sampling interval:

A) Methane;

B) Pressure;

C) Nitrogen;

D) Oxygen;

E) Carbon dioxide; and

F) Any compound on the list of air toxics, adopted by the Board pursuant to Section 9.5 of the Act, which is expected to be produced in the landfill unit." 35 Ill. Adm. Code §811.310(d)(1) (1991).

WMI contends that this regulation is arbitrary and capricious because the record contains no evidence concerning the technical feasibility and economic reasonableness of measuring the unspecified air toxics. Also, although the EcIS prepared for these proceedings considers the parameters listed in sections 811.310(d)(1)(A) through (d)(1)(E), there is no way to consider the economic impact of monitoring for a list of air toxics to be created later in a separate regulatory proceeding.

The Board responds that pursuant to section 9.5 of the Act, it must promulgate a list of air toxic contaminants for the purpose of regulating those contaminants in Illinois. (Ill. Rev. Stat. 1989, ch. 111½, par. 1009.5.) At the time the instant regulations were adopted, the Board had not yet promulgated the list. According to the Board, it will consider the matters of technical feasibility, economic reasonableness and economic impact in its rulemaking proceeding under section 9.5 of the Act. The Board further maintains that section 811.310(d)(1)(F) does not require monitoring for all air toxics contained on the list, but rather only for those listed air toxics that are expected to be produced in that particular landfill. The Board states that it has no way of knowing exactly which air contaminants may be emitted from a particular landfill and must be accorded some discretion to adopt comprehensive regulations in order to protect the environment. If the Agency determines that a listed air toxic will be emitted from a particular landfill, it will require monitoring for that toxic in the landfill's operating permit. If a landfill operator disagrees, it may challenge the requirement in a permit appeal. In summary, the Board maintains that the statutory criteria will be met, that the rights of the landfill operators are adequately safeguarded and that the regulation is therefore not arbitrary and capricious.

■ In arguing that section 811.310(d)(1)(F) does in fact satisfy the requirements of the Act, the Board states that the list of air toxics will be promulgated in a rulemaking procedure pursuant to section 9.5 of the Act, which "include[s] the requirements of a public hearing and opportunity for public comment." However, section 9.5(c) specifically provides that the public hearing and comment requirements of section 27(b) "shall not apply" to the rulemaking proceeding in which the list of air toxic contaminants is promulgated. (Ill. Rev. Stat. 1989, ch. 111½, par. 1009.5(c).) Section 9.5 merely gives the Board the au-

thority to compile a list. Section 27 sets out the procedures the Board must follow before enacting regulations, including the requirement of public hearings and comments on the regulation's economic impact. By incorporating the not yet promulgated list of air toxic contaminants into section 811.310(d)(1)(F), the Board has failed to meet the requirements of section 27(b) of the Act. We conclude, therefore, that section 811.310(d)(1)(F) is invalid.

WMI next contends that the Board acted arbitrarily and capriciously in adopting section 811.312, which requires that landfill gas-processing systems that accept 50% or more of their total gas volume from one landfill must remain under the control of the landfill operator and be considered a part of the waste disposal facility. The specific portions of the regulation challenged are as follows:

"b) Except as allowed in subsection (g), the landfill gas processing and disposal system, including compressors, blowers, raw gas monitoring systems, devices used to control the flow of gas from the unit, flares, gas treatment devices, air pollution control devices and monitoring equipment must remain under the control of the operator and shall be considered part of the waste disposal facility.

\* \* \*

g) Landfill gas may be transported offsite to a gas processing facility in accordance with the following requirements:

1) The solid waste disposal facility contributes less than 50 percent of the total volume of gas accepted by the gas processing facility. Otherwise, the processing facility must be considered a part of the solid waste management facility." 35 Ill. Adm. Code §§811.312(b), (g)(1) (1991).

WMI contends that this regulation will unduly restrict the development of the relatively new gas-processing industry and will encourage landfill operators to simply burn the gas rather than sell it to be processed for beneficial use. WMI argues that the regulation is accordingly arbitrary and capricious and runs contrary to the Board's stated intent to encourage gas processing. (35 Ill. Adm. Code §811.312(a) (1991).) Also, WMI contends that the regulation exceeds the Board's statutory authority because it attempts to control the gas-processing industry instead of focusing on the handling of the gas itself. Finally, WMI maintains that the regulation is unconstitutional in that it is not rationally related to the goal of providing a technically feasible and economically reasonable means of controlling landfill gas and also because it deprives landfill operators of their property without due process of law.

The Board responds that the purpose of the regulation is not to control the gas-processing industry but rather to ensure that gas generated at a landfill is treated in a manner which meets the requirements of the landfill regulations and the Act. The record shows that the STS staff determined that a gas-disposal system must be considered a part of the facility in order to ensure that an adequate system for gas disposal was always available, accessible and controllable by the landfill operator. In its response to comments, the STS staff stated that the gas-processing operation may be contracted to others, but that the landfill operator must retain responsibility for compliance with the Act. In determining whether the gas-processing operation should be considered a part of the facility, the STS staff suggested consideration of the following points:

"1. The flow rate of gas from the unit must always be under control of the operator and adjusted as necessary according to monitoring results.

2. The purpose of the gas collection system is to prevent off-site migration and damage by landfill gas, the purpose is not to provide raw materials to an industrial operation.

3. The operator must always have a way to dispose of landfill gas.

4. In the event that an operator forfeits financial assurance the State of Illinois must have access to a gas disposal system or the financial assurance instrument must contain sufficient funds to build and operate a disposal system.

5. The proper disposal of gas by-products from the processing operation must be ensured.

6. All aspects of the gas removal operation must be under the control of the operator at all times."

The STS staff stated in its proposal in docket R84-17 that "[t]he most appropriate way to address these concerns is to require that a gas processing facility that accepts more than 50 percent of its gas from a single solid waste disposal facility be permitted as part of that facility."

 We recognize that the regulation in question may impact adversely upon the development of the gas-processing industry. However, it appears clear that the purpose of the Board was to ensure adequate, accessible gas-disposal facilities and to prevent off-site migration. Any impact on the gas-processing industry would be an incidental effect of the regulation. Although WMI disagrees with the method chosen by the Board to further its stated purpose, we are not persuaded that the Board's regulation concerning control of certain

gas-processing facilities is arbitrary and capricious or is not rationally related to its goal of ensuring compliance with the Act. For these reasons, we reject WMI's challenge to sections 811.312(b) and (g)(1).

WMI next challenges the groundwater modeling and monitoring requirements contained in sections 811.317 through 811.320. Essentially, the regulations require the use of computerized contaminant transport modeling to calculate a maximum allowable predicted concentration for each particular leachate constituent in the groundwater. Leachate is liquid that has been in contact with the solid waste. The landfill operator must then monitor the groundwater to determine whether the level of the constituent in the groundwater exceeds the level predicted by the model. If the model is exceeded, the regulations require a series of steps to be followed, beginning with confirmation and assessment tests and leading to corrective action procedures or a revision of the model.

WMI contends that it supports the use of groundwater modeling in appropriate situations but that the use of a contaminant transport model to establish maximum allowable predicted concentrations misuses the discipline. WMI states that such modeling is an imprecise science and that results would vary depending on the judgments made and the input data used. In addition, groundwater monitoring results can vary widely based on several factors. WMI contends that the Board acted arbitrarily in requiring the use of groundwater modeling to establish specific and inflexible single number limits which, if exceeded, result in costly investigation and corrective action procedures.

The Board responds that the technical support for its groundwater modeling and monitoring requirements was provided primarily by Dr. Aaron Jennings during the June 16, 1986, hearing. That hearing contained lengthy and detailed testimony concerning the fundamentals of contaminant transport modeling. Dr. Jennings made the following comments after reviewing the February 25, 1988, first notice opinion and the public comments:

> "Since the Board has offered to entertain further comment on the concern that contaminant transport modeling is inappropriate as proposed, I will offer the following. Most of the criticisms I have heard are thoroughly flawed. The proposed modeling requires that designers be able to anticipate the most serious environmental problems with landfills.
>
> It is true that there are poor models and poor applications of good models. *** However, I feel the safeguards built into the proposal (specifically the requirements for model documenta-

tion, field calibration, and results sensitivity analysis) are sufficient to guard against gross misuse.

It is also true that the transport problems can be complex. However, if the proposed operations are too complex for competent professionals to anticipate with the best available scientific models (i.e. by engineering analysis), then they are too unpredictable to be allowed. \*\*\*

\*\*\* [U]nless one can make a reasonable assessment about the magnitude of the most serious environmental problems, how could the facility be allowed at all?"

The DENR provided examples of cases and studies where groundwater flow and contaminant transport modeling have been successfully used. At the November 27, 1989, EcIS hearing, Ms. Uhlman of the DENR stated:

"Briefly, these references should establish that groundwater modeling has been a successful tool in predicting ground water advective and diffusive transport. These models have been applied to complicated geologic scenarios and have, in many instances, been successfully calibrated and verified. A skilled hydrogeologist should be able to make acceptable predictions using these readily available computer codes. Adjusting landfill facility design in response to modeled expected and worst-case scenarios will reduce the need for assessment monitoring and the potential for facility failure."

■ In making its argument against the groundwater modeling and monitoring requirements, WMI points to expert testimony stating that modeling is an imprecise science and that meaningful conclusions can only be drawn from comparing modeled and monitored numbers through the application of technical expertise rather than through the application of bright line compliance levels. Essentially, WMI is asking us to weigh the conflicting testimony before the Board. However, as we stated earlier, the Board in exercising its rulemaking powers is performing a quasi-legislative function and therefore is not required to support its conclusions with a given quantum of evidence. (*Illinois State Chamber of Commerce v. Pollution Control Board* (1988), 177 Ill. App. 3d 923, 928, 532 N.E.2d 987.) We believe that the record shows that the Board did consider all important aspects of the problem and offered a plausible explanation for its decision that was supported by the evidence, particularly by the testimony of Dr. Jennings. We are therefore not persuaded that the regulations in question are arbitrary and capricious.

The next regulation challenged by WMI is section 811.320(a), which requires that groundwater quality be maintained at each waste constituent's background concentration for a period of 100 years following closure of the last unit of the landfill facility, as measured at least 100 feet from the landfill boundary. (35 Ill. Adm. Code §811.320(a) (1991).) WMI contends that the record fails to support the regulation and indicates that it will be almost impossible to satisfy with respect to certain constituents.

In support of its contention, WMI argues that the basis of this regulation was a study by Bruce Hensel, Richard Berg and Robert Griffin of the Illinois State Geological Survey (Hensel study). WMI states that "it appears that the Board limited the required compliance showing to 100 years precisely because of the problems with modeling chlorides for periods greater than 100 years." However, the Board's decision to run the 100-year period from the time of closure actually adds another 20 to 30 years (the typical design length of a landfill) and therefore requires compliance past the intended 100-year period.

The Board responds that there is nothing in the record to support WMI's assertion that the 100-year compliance period was based on problems with modeling chlorides. Also, the Board notes that the model results described in the Hensel study were based on a worst-case scenario and were necessarily generalized for the development of the regulations. The Board argues that its requirement that groundwater quality be maintained at background concentrations for 100 feet for 100 years after closure of the last unit accepting waste is technically feasible in certain geological scenarios.

It appears that WMI's contentions with respect to section 811.320(a) are based upon assumptions which the Board claims are not supported by the record. The record shows that the Board had before it considerable evidence concerning the technical feasibility of this regulation. It is not the court's role to determine if the manifest weight of the evidence reveals that it was technically feasible for a substantial number of the affected sources to comply with the regulation. (*Stepan Co. v. Pollution Control Board* (1990), 193 Ill. App. 3d 827, 834, 550 N.E.2d 682.) The fact that the Board heard and appreciated the concerns of a participant is sufficient to satisfy the statutory requirement that technical feasibility be considered. (*Stepan*, 193 Ill. App. 3d 827, 550 N.E.2d 682.) While WMI disagrees with the ultimate conclusions which the Board drew from the evidence, we do not believe that there is a sufficient basis to warrant holding the regulation invalid.

WMI next contends that the Board failed to consider the economic impact of section 811.319(a)(2)(A), which requires initial monitoring for all constituents which "may otherwise cause or contribute to groundwater contamination." Specifically, section 811.319(a)(2) provides as follows:

"2) Criteria for Choosing Constituents to be Monitored

A) The operator shall monitor each well for constituents that will provide a means for detecting groundwater contamination. Constituents shall be chosen for monitoring if they meet the following requirements:

i) The constituent appears in, or is expected to be in, the leachate; and

ii) The Board has established for the constituent a public or food processing water supply standard, at 35 Ill. Adm. Code 302, the Board has established a groundwater quality standard under the Illinois Groundwater Protection Act (Ill. Rev. Stat. 1989, ch. 111½, par. 7451 *et seq.*), or the constituent may otherwise cause or contribute to groundwater contamination.

B) One or more indicator constituents, representative of the transport processes of constituents in the leachate, may be chosen for monitoring in place of the constituents it represents. The use of such indicator constituents must be included in an Agency approved permit." (35 Ill. Adm. Code §§811.319(a)(2)(A), (a)(2)(B) (1991).)

WMI contends that the language which requires monitoring of constituents which may cause or otherwise contribute to groundwater contamination is arbitrary because the EcIS did not, and could not, consider the economic impact of monitoring for an open-ended list of constituents.

■ The Board responds that because the regulations are of general applicability, it would be impossible to quantify all the economic costs for each individual constituent which may be found in any given landfill. The Board maintains that the EcIS did cover the economic impact of monitoring any constituent which is presently known to exist at landfills. Also, the subsections of section 811.319 provide certain safeguards for the landfill operator. For example, subsection (a)(2)(A)(i) requires monitoring only for those constituents which appear in, or are expected to be in, the leachate at the landfill. Subsection (B) further narrows the monitoring requirement by allowing the use of "indicator constituents" which represent the transport processes of constituents in the leachate, to be monitored in place of the

constituents they represent. Although the Board did not consider the impact of monitoring each and every conceivable constituent, we believe that it had before it sufficient evidence to fulfill its statutory requirement to consider whether there would be an adverse economic impact on the people of this State. (Ill. Rev. Stat. 1989, ch. 111½, par. 1027(b).) We therefore reject WMI's contention that section 811.319(a)(2)(A) is arbitrary and capricious.

WMI next contends that the Board exceeded its statutory authority in promulgating regulations which adopted a Construction Quality Assurance Program. (35 Ill. Adm. Code §§811.501 through 811.509 (1991).) Section 811.501 states that "[a]ll structures necessary to comply with the requirements of [the regulations for new solid waste landfills] shall be constructed according to a construction quality assurance program." (35 Ill. Adm. Code §811.501 (1991).) The regulations require the landfill operator to designate a professional engineer, other than the operator or an employee of the operator, as a construction quality assurance (CQA) officer. The regulations then set forth a series of inspection, reporting and on-site responsibilities to be carried out by the CQA officer. Section 811.503(a) requires the CQA officer to supervise and monitor the following activities:

"1) Compaction of the subgrade and foundation to design parameters;

2) Installation of the compacted earth liner;

3) Installation of a geomembrane;

4) Installation of slurry trenches or cutoff walls;

5) Installation of the leachate drainage and collection system;

6) Application of final cover;

7) Installation of gas control facilities; and

8) Construction of ponds, ditches, lagoons, and berms." (35 Ill. Adm. Code §811.503(a) (1991).)

WMI contends that the breadth of the CQA officer's responsibilities is such that he would be required to be present on the landfill full time, even after the commencement of operations. According to WMI, the regulations really amount to a contract inspection program with the expense to be borne by the landfill operator. WMI asserts that the Board has no authority under the Act to assign inspection authority to a third-party contractor hired by the landfill operator or to require the operator to privately contract with and pay a third-party inspector. It maintains that the Act expressly provides that landfill inspection is the province of the Agency (Ill. Rev. Stat. 1989, ch. 111½, pars. 1004(c), (d)), and that the cost of the Agency inspections are to

be covered by the permit fees (Ill. Rev. Stat. 1989, ch. 111½, par. 1005(f)).

The Board responds that its authority to promulgate the Construction Quality Assurance Program regulations derive from section 22(a) of the Act, which authorizes the Board to adopt regulations concerning "[s]tandards for the location, design, construction, sanitation, operation, maintenance, and discontinuance of the operation of refuse collection and disposal." (Ill. Rev. Stat. 1989, ch. 111½, par. 1022(a).) Section 2(c) of the Act provides that "[t]he terms and provisions of this Act shall be liberally construed so as to effectuate the purposes of this Act." (Ill. Rev. Stat. 1989, ch. 111½, par. 1002(c).) Section 2(b) states that purpose as follows:

> "It is the purpose of this Act *** to establish a unified, state-wide program supplemented by private remedies, to restore, protect and enhance the quality of the environment, and to assure that adverse effects upon the environment are fully considered and borne by those who cause them." (Ill. Rev. Stat. 1989, ch. 111½, par. 1002(b).)

The Board maintains that the purpose of the challenged regulations is to provide quality assurance during any and all phases of landfill construction and not just the initial phase. Also, it states that the costs of the CQA program incurred by a landfill operator are attributable to construction and cannot be considered permit, or inspection, fees.

■ WMI's position depends to a large extent upon whether the costs attributable to hiring the CQA officer are properly characterized as construction costs or inspection costs. WMI maintains that the duties of the CQA officer are so extensive that they cannot be said to pertain only to construction. The Board holds a contrary view. The actual CQA officer's duties, which form the basis of the parties' disagreement, are technical in nature. We believe that in a situation such as this, we must necessarily defer to the technical expertise of the Board and uphold the regulations in question.

WMI next contends that the Board exceeded its statutory authority in adopting a regulation which prevents commercial landfills from self-insuring. Section 21.1 of the Act requires certain landfill operators to post a performance bond or other security for the purpose of ensuring closure of the site and post-closure care. (Ill. Rev. Stat. 1989, ch. 111½, par. 1021.1(a).) One of the means of providing the required financial assurance is through self-insurance. (35 Ill. Adm. Code §811.715 (1991).) Section 811.715(d) sets out a gross revenue test which a landfill operator must meet in order to provide financial assurance through self-insurance. The test is as follows:

"Gross Revenue Test. The operator shall demonstrate that less than one-half of its gross revenues are derived from waste disposal operations. Revenue is 'from waste disposal operations' if it would stop upon cessation of the operator's waste disposal operations." (35 Ill. Adm. Code §811.715(d) (1991).)

WMI asserts that the effect of this regulation is to allow only noncommercial landfills, *i.e.*, those located at and operated by industrial facilities to receive their own waste, to self-insure. WMI contends that in drawing a distinction between commercial and noncommercial landfills, the Board imposed an arbitrary and capricious classification, acted in excess of its statutory authority, and violated the equal protection rights of commercial landfill operators.

The Board responds that the intent of the gross revenue test is to protect against business failure by the self-insured by ensuring that there is a continuing stream of revenue from other operations with which to fund closure and post-closure care. The regulation is therefore rationally related to the legitimate State interest of avoiding the use of public funds for those purposes.

At the hearings before the Board, Morton F. Dorothy of the STS staff testified as follows concerning the gross revenue test:

"The financial test is based on the hazardous waste rules which were based on a U.S.E.P.A. study of financial information concerning a mix of business entities. *** The study on which the test was based was a mixture of companies which were primarily diversified manufacturing companies rather than commercial disposal firms.

The Board added the gross revenues test as a method of excluding firms which were primarily commercial disposal firms which resembled those on which the financial test was based.
***

A diversified manufacturing company *** would be entitled to self-insure assuming they met the financial test, the rational[e] being that some events could occur which would result in unforeseen closure of their landfill, and yet there would be a reason to believe that they would have assets which are not involved in the landfill business which could provide a stream of cash which could be used for closure and post-closure care as opposed to a business which is simply a landfill business which would not be expected to survive [an] order to cease conducting landfill operations."

■■■ WMI suggests that the Board should have based the opportunity to self-insure upon the percentage of the company's total reve-

nues attributable to the operation of the particular landfill site where closure is being funded. The question before us, however, is whether the Board acted arbitrarily in that it offered an explanation for its decision that ran counter to the evidence or was so implausible that it could not be ascribed to a difference in view or the product of Agency experience. (*Greer v. Illinois Housing Development Authority* (1988), 122 Ill. 2d 462, 506, 524 N.E.2d 561.) We believe that the basis of the Board's regulation, as explained in the testimony of Dorothy, was sufficient to satisfy the requirements that the regulation be rationally related to a legitimate State purpose and that it not be arbitrary and capricious.

WMI next contends that the Board exceeded its statutory authority in adopting a regulation that purports to delay the finality of an Agency decision pending Agency reconsideration. Section 813.106, titled "Permit Appeals," provides as follows:

"a) If the Agency refuses to grant or grants with conditions a permit the applicant may, within 35 days, petition for a hearing before the Board to contest the decision of the Agency. (Section 40(a)(1) of the Act) The petition shall be filed, and the proceeding conducted, pursuant to the procedures of Section 40 of the Act and 35 Ill. Adm. Code [§]105.

b) Any Agency action to deny a permit or to grant a permit with conditions will not be deemed final for the purposes of appeal if the applicant has requested Agency reconsideration of that action prior to the filing of a petition pursuant to this Section." (35 Ill. Adm. Code §813.106 (1991).)

Section 40 of the Act states that "[i]f the Agency refuses to grant or grants with conditions a permit under Section 39 of this Act, the applicant may, within 35 days, petition for a hearing before the Board to contest the decision of the Agency." (Ill. Rev. Stat. 1989, ch. 111½, par. 1040(a)(1).) Section 39 provides, in pertinent part:

"[I]t shall be the duty of the Agency to issue \*\*\* a permit upon proof by the applicant that the facility \*\*\* will not cause a violation of this Act or of regulations hereunder.

\* \* \*

If there is no final action by the Agency within 90 days after the filing of the application for permit, the applicant may deem the permit issued; except that this time period shall be extended to 180 days when \*\*\* the application which was filed is for any permit to develop a landfill subject to issuance pursuant to this subsection." Ill. Rev. Stat. 1989, ch. 111½, par. 1039(a).

WMI argues that the Act does not confer upon the Board the authority to allow Agency reconsideration of a permit application, particularly where no time limits are imposed upon the reconsideration. WMI maintains that the statutory scheme outlined above contemplates prompt action by the Agency. Yet the effect of the reconsideration provision in section 813.106(b) is to delay the finality of Agency action and, consequently, of all subsequent procedures for review of the initial Agency decision. According to WMI, the regulation may prevent appeal of an adverse Agency action for the entire duration of a potentially lengthy period of reconsideration.[1]

The Board responds only that WMI has waived its right to challenge this regulation because it did not raise an objection before the Board. The failure to object at the original administrative proceeding generally constitutes a waiver of the right to raise the issue on appeal. (*City of Rockford v. County of Winnebago* (1989), 186 Ill. App. 3d 303, 313, 542 N.E.2d 423.) However, the rule that an appellate court should confine itself to issues raised in earlier proceedings is not a rigid or inflexible one, and a reviewing court has discretion to consider questions of law not passed upon by an administrative agency. (*Wadlington v. Mindes* (1970), 45 Ill. 2d 447, 453, 259 N.E.2d 257.) In our view this is an appropriate case for the exercise of our discretion to consider the issue raised by WMI.

■■ We believe that WMI's argument concerning section 813.106(b) has merit. In *Weingart v. Department of Labor* (1988), 122 Ill. 2d 1, 15, 521 N.E.2d 913, the Illinois Supreme Court stated that it has been consistently held that an administrative agency may allow a rehearing, or modify and alter its decisions only when authorized to do so by statute. In *Reichhold Chemicals, Inc. v. Pollution Control Board* (1990), 204 Ill. App. 3d 674, 561 N.E.2d 1343, the appellate court considered a situation in which the permit applicant was denied a permit, then accepted the Agency's invitation to request reconsideration of the permit denial. While the Agency reconsideration was pending, the applicant filed a petition for review with the Board. The Board dismissed the petition on the grounds that the applicant's request for reconsideration was pending with the Agency, and the applicant appealed. The appellate court reversed, holding that the Act does not grant the Agency any authority to modify or reconsider its deci-

---

[1]WMI also argues that section 813.106(b) violates section 3—101 of the Illinois Administrative Law (Ill. Rev. Stat. 1989, ch. 110, par. 3—101). As noted by the Board, however, section 3—101 governs actions for judicial review of a final administrative decision and does not apply to appeals from one agency to another.

sions. The court further stated that "no rules establishing a rehearing procedure with time limits, notice requirements, and other customary provisions have been cited to us." (*Reichhold*, 204 Ill. App. 3d at 678, 561 N.E.2d at 1345.) The court then made the following comment:

> "We recognize the problem confronting the Agency in these cases. Under the Act, if the Agency does not either grant or deny a permit within 90 days of receipt of the application, the permit will issue by operation of law. The statute thus contemplates prompt action by the Agency followed by a 35-day period in which the applicant may seek review before the Board. When the Agency denies an application, the applicant's only options are to start over with a new application or file a petition for review. Requests to modify or reconsider are not permissible under the present statutory scheme. Any hardships resulting from this arrangement should be addressed by the Illinois legislature." (*Reichhold*, 204 Ill. App. 3d at 679-80, 561 N.E.2d at 1346.)

In light of the statutory scheme governing permit applications and the case law discussed above, we believe that the Board exceeded its statutory authority in promulgating a regulation purporting to delay the finality of an Agency decision pending reconsideration. Section 813.106(b) is accordingly invalid.

WMI next contends that the Board exceeded its statutory authority in adopting section 813.201(b), which allows the Agency to unilaterally modify a permit under certain specified circumstances. (35 Ill. Adm. Code §813.201(b) (1991).) WMI argues that, with the exception of one situation not applicable here, the Act confers no authority upon the Board or the Agency to take action with respect to a permit that has already been granted.

Section 39(a) of the Act provides that "[i]n granting permits the Agency may impose such conditions as may be necessary to accomplish the purposes of this Act, and as are not inconsistent with the regulations promulgated by the Board hereunder." (Ill. Rev. Stat. 1989, ch. 111½, par. 1039(a).) This court upheld the imposition of post-approval Agency modifications in *Browning-Ferris Industries of Illinois, Inc. v. Pollution Control Board* (1989), 179 Ill. App. 3d 598, 534 N.E.2d 616. We believe that the decision in *Browning-Ferris* is dispositive of the issue here. Accordingly, there is no basis upon which to invalidate section 813.201(b).

WMI next contends that the Board failed to comply with the applicable law, including its regulations and resolutions, regarding contact with its scientific/technical section staff. As discussed earlier in

this opinion, the Board at one point ordered that members of the STS staff who would be testifying in support of the staff's own proposal be considered exterior to the Board for purposes of the *ex parte* contact rules. Later, the Board rescinded the order and resumed communications with the staff. WMI states that it "feels *** that in certain limited areas the complexity of the proceedings and the record and the nature of the role played by the Board's own staff have led to adoption of regulations which are not supported by the record." WMI asks this court to scrutinize "those portions of the *** regulations which are not supported by the record or which improperly reflect the views of the STS on disputed technical issues."

■■■ We have considered the validity of the specific regulations raised by WMI in this appeal. In our opinion, WMI's argument concerning the Board's relationship with the STS staff is too vague to support any type of relief.

■■■ Finally, we note that certain regulations originally challenged by WMI are no longer at issue in this appeal. WMI has withdrawn that portion of its appeal challenging the inert waste landfill regulations in sections 811.201 through 811.207. Also, WMI has conceded that sections 811.318 and 811.319 expressly limit the groundwater monitoring requirements to the uppermost aquifer. Finally, WMI states that its challenge to a one-year exemption from compliance with the regulations granted to certain industries in section 811.101(b) is moot.

Accordingly, the order of the Board is affirmed in part and reversed in part.

Affirmed in part; reversed in part.

JOHNSON and LINN, JJ., concur.